Pavel I. Pogodin, Ph.D., Esq. (SBN 206441)
CONSENSUS LAW
5245 Av. Isla Verde
Suite 302
Carolina, PR 00979
United States of America
Telephone: (650) 469-3750
Facsimile: (650) 472-8961
Email: pp@consensuslaw.io

Attorneys for Plaintiff Bitcoin Manipulation Abatement LLC

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Bitcoin Manipulation Abatement LLC,<br><br>Plaintiff,<br><br>v.<br><br>Ripple Labs, Inc., XRP II, LLC and Bradley Garlinghouse,<br><br>Defendants. | Case No.  3:20-cv-3022<br><br>**COMPLAINT FOR UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF 15 U.S.C. § 77l(A)(1), CONTROL PERSON LIABILITY UNDER 15 U.S.C. § 77o, UNREGISTERED OFFER AND SALE OF SECURITIES IN VIOLATION OF CAL. CORP. CODE § 25503, CONTROL PERSON LIABILITY UNDER CAL. CORP. CODE § 25504, MISREPRESENTATION IN VIOLATION OF CAL. CORP. CODE §§ 25401, 25501 AND 25504.1, AND UNFAIR BUSINESS PRACTICES IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200 ET SEQ. AND FALSE ADVERTISING IN VIOLATION OF CAL. BUS. & PROF. CODE § 17500 ET SEQ.**<br><br>**DEMAND FOR JURY TRIAL** |

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL)  - 1 -     BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO.  3:20-CV-3022

**COMPLAINT**

Plaintiff, Bitcoin Manipulation Abatement LLC ("Plaintiff", "BMA"), by and through its undersigned attorneys, for its Complaint against Defendant Ripple Labs, Inc. ("Ripple" or "Ripple Labs"), Defendant XRP II, LLC ("XRP II") and Defendant Bradley Garlinghouse ("Garlinghouse") (collectively "Defendants") alleges as follows:

**INTRODUCTION**

1.      This action arises out of a scheme by Defendants to raise more than billion dollars through sales of XRP—an unregistered security—to retail investors in violation of the registration provisions of federal and California securities laws with the primary purpose to enrich Ripple's executives, directors, founders, and affiliates.  Additionally, in order to drive demand for and thereby increase profits from the sale of XRP, Defendants have made a litany of false and misleading statements regarding XRP in violation of California's securities laws, and false advertising and unfair competition laws.

2.      XRP is a security because the purchasers thereof were conditioned to expect and in fact expected to profit from Ripple 's success.  Sale of XRP by Defendants was a clear offer and sale of securities because, inter alia, Defendants touted, and Plaintiff and other XRP purchasers were conditioned to expect, and did reasonably expect, that the XRP received would increase in value and become worth more than the fiat and/or virtual currencies invested.  Indeed, Defendants have explicitly referred to purchasers of XRP as "investors" and repeatedly stressed their intention to keep the value of XRP stable and increasing, and that XRP would be a long-term growth asset.  XRP is not a currency because, among other things, there are no products or services that can be purchased with XRP. Rather, there is an expectation on the part of investors that they will profit if Ripple builds out the functionalities and alliances that it has promised.

3.      Sections 5(a) and 5(c) of the Securities Act require that an issuer of securities like XRP register its offers and sales of securities with the SEC.  Similar registration requirements are imposed by Section 25110 of the California's securities law.  The registration requirements under the federal securities laws and California state law are designed to protect investors by ensuring

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL)  - 2 -        BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

they are provided adequate information upon which to base their investment decisions. Absent registration or qualification, issuers of securities are able to market their securities with no disclosure requirements whatsoever. For example, an issuer could omit any information that might make a potential investor think twice before investing (e.g., conflicts of interest or major setbacks to core product lines), peddle its securities using unbounded exaggerations regarding the progress of its products, business plan, business strategies, or even fabricate the existence of relationships with vendors or other business partners.

4.      Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act and Section 25110 of the California's securities law provide for strict liability against any person who offers or sells an unregistered/unqualified security. As detailed herein, the sale of XRP by Defendants was, at all relevant times, an offer and sale of unregistered securities. Accordingly, Defendants are strictly liable under Section 12(a)(1) of the Securities Act. Defendants are strictly liable for the offering and selling of unregistered securities in connection with the sale of XRP to general public starting on May 18, 2017. Nevertheless, with respect to Plaintiffs' Registration Claims, Defendants' deceptive activity is outlined herein to demonstrate the Defendants' control over XRP and Defendants' conditioning of the marketplace to expect a profit from purchasing XRP -- a characteristic of an investment contract security.

5.      Unlike decentralized cryptocurrencies such as Bitcoin and Ethereum, which are mined in a decentralized manner by operators of network nodes as a reward for validating transactions on their respective networks, which requires expenditure of significant resources, such as electricity, all 100 billion of the XRP in existence were "printed" in a centralized manner, without incurring any significant costs, by Ripple at its inception in 2013, before any distribution thereof and without any real life utility or any other useful functionality except for its sole use as a speculative investment.   In other words, unlike some virtual currencies, XRP was fully generated prior to its distribution.  Twenty billion XRP, or 20 percent of the total XRP supply,

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL)  - 3 -      BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

were given to the individual founders of Ripple, with the remaining 80 billion XRP retained by Ripple itself.

6.      Moreover, XRP is not a decentralized cryptocurrency like Bitcoin, which is mined by a decentralized set of nodes as a compensation for verifying network transactions. As recently stated by CoinMotion, a crypto-token exchange that listed XRP, in a blog post entitled XRP is a Centralized Virtual Currency, "the Ripple system appears to be centralized for all practical purposes. It probably lacks many interesting technical features that Bitcoin has, such as resistance to censorship."

7.      Defendants have since earned massive profits by selling off XRP to the general public, in numerous offerings, having sold over $1.1 billion in XRP to retail consumers in exchange for legal tender or cryptocurrencies (most often Bitcoin and Ethereum). The value of XRP owned by Defendants substantially exceeds the value of Ripple's revenue or cashflow from all other sources. Ripple's dominant value proposition is the XRP tokens it owns and sells. Ripple's value proposition as a company depends upon the promotion of XRP, yet XRP is entirely or essentially pre-functional and purchased by investors in anticipation of profit based on the efforts of Ripple.

8.      In order to drive demand for XRP, and thereby increase the profits it can derive by selling XRP, Ripple has portrayed XRP as a good investment, relayed optimistic price predictions, and conflated Ripple's enterprise business with usage of XRP. Ripple is inextricably linked to the promotion of XRP.  Ripple lines up crypto-exchanges to list XRP and pays substantial listing fees as part of those promotional efforts, and Ripple's website links to trading markets for XRP, to facilitate additional purchases by retail customers.  Ripple also placed a substantial percentage of XRP that it owned into escrow and developed a plan as to when XRP should be sold and in what quantities, all to limit selling pressure on the market in order to prop-up the price of XRP.  For example, in 2014, Ripple publicly stated on its www.ripplelabs.com/xrp-distribution/ website that "we will engage in distribution strategies that we expect will result in a stable or strengthening XRP exchange rate against other currencies."

Ripple greatly increased these efforts to push XRP on the general public starting on May 18, 2017, when Ripple began listing XRP on U.S. cryptocurrency exchanges, such as Kraken. The price of XRP has fallen dramatically since early 2018, leaving its investors, including Plaintiff, with substantial financial losses.

9.    Defendants also reportedly offered to pay substantial sums of money to popular U.S.-based cryptocurrency exchanges Coinbase, Inc. ("Coinbase") and Gemini Trust Company, LLC ("Gemini") to list XRP. In or about the fall of 2017, Ripple is reported to have offered Coinbase more than $100 million worth of XRP to start letting Coinbase users trade XRP. A Ripple executive is also reported to have asked whether a $1 million cash payment could persuade Gemini to list XRP in the third quarter of 2017. Although both Gemini and Coinbase declined to pursue these proposals, rumors that XRP would be added to Coinbase fueled its price increase in late 2017 and early 2018. Ripple was the source of these rumors.

10.    Federal securities laws require any security that is offered or sold in the U.S. to be registered with the Securities and Exchange Commission ("SEC"). Similarly, California Securities Laws require that securities offered or sold be either qualified with the Commissioner of Corporations or exempted from registration by a specific Rule of the Commissioner or law. These securities laws are designed to protect the public by requiring various disclosures so that investors can better understand the security that is being offered or sold, as well as risks associated with investment in that security. Absent the disclosures required by law about those efforts and the progress and prospects of the enterprise, significant informational asymmetries may exist between the management and promoters of the enterprise on the one hand, and investors and prospective investors on the other hand. The reduction of these information asymmetries through required disclosures protects investors and is one of the primary purposes of the securities laws.

11.    Under section 2(a)(1) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77b(a)(1), a "security" is defined to include an "investment contract." Similarly, section 25019 of the California Corporations Code defines a "security" to include an "investment contract."

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL)   - 5 -   BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-cv-3022

12.     The SEC has made it clear that digital tokens, such as XRP, often constitute "securities and may not be lawfully sold without registration with the SEC or pursuant to an exemption from registration." One of the top financial regulators in President Obama's administration has likewise stated that there is a "strong case" to conclude that "particularly Ripple" has violated securities laws by issuing and trading "noncompliant securities."

13.     The SEC's Strategic Hub for Innovation and Financial Technology ("FinHub") has also published the Framework for 'Investment Contract' Analysis of Digital Assets ("SEC Framework"), providing guidance for assessing whether a crypto-token offering is a security under federal law. As explained in more detail below, applying the analysis in the SEC Framework and applicable precedent, the XRP tokens offered and sold by Defendants have all the traditional hallmarks of a security, as reflected in SEC v. W.J. Howey Co., 328 U.S. 293 (1946) ("Howey"), and subsequent case law. XRP tokens also qualify as a security under California law.

14.     XRP purchasers, including Plaintiff, provided money consideration (in the form of fiat, including U.S. dollars, or other cryptocurrencies, such as Bitcoin) in exchange for XRP. XRP purchasers reasonably expected to derive profits from their ownership of XRP, and Defendants themselves have frequently highlighted this profit motive and have taken steps to accomplish it, including by promoting XRP. Additionally, the development of the XRP Ledger, and the profits that investors expected to derive therefrom, were, and are, based on the technical, managerial, and entrepreneurial efforts of Defendants and other third parties employed by Defendants.

15.     However, Defendants did not register XRP with the SEC or qualify it with the California Commissioner of Corporations, and many of the representations Defendants made regarding XRP were designed to drive demand of XRP, allowing Defendants to obtain greater returns on their XRP sales.   This is exactly the situation that federal and state securities laws were enacted to prevent.

## NATURE OF ACTION

16.     This is an action to recover damages and to obtain other relief that Plaintiff has sustained due to Defendants' unregistered and unqualified offers and sales of securities in

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL)  - 6 -     BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-cv-3022

violation of Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77l, and 77o, and Sections 25110, 25503, 25504, and 25401 of the California Corporations Code and false advertising and unfair competition under California law.

## PARTIES

17.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-16 above as if fully set forth herein.

18.     Plaintiff BMA is a limited liability company duly formed and existing under the laws of the United States territory of Puerto Rico.

19.     Defendant Ripple Labs, Inc. is a Delaware corporation with its principal place of business located at 315 Montgomery St, San Francisco, California, 94104, United States.

20.     Defendant XRP II, LLC is a New York limited liability company with its principal place of business located at 315 Montgomery St, San Francisco, California, 94104, United States.

21.     Defendant Garlinghouse is the Chief Executive Officer of Ripple, a position he has held since January 2017.  Defendant Garlinghouse was Ripple's President and Chief Operating Officer from April 2015 through December 2016.  Defendant Garlinghouse is a resident of San Mateo, California.  Defendant Garlinghouse exercised control over Ripple and directed and/or authorized, directly or indirectly, the sale and solicitation of XRP to the public.

## JURISDICTION AND VENUE

22.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-21 above as if fully set forth herein.

23.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367.  Specifically, this Court has jurisdiction over the claims of violations under California securities law pursuant to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).

24.     This Court has personal jurisdiction over Defendants, and each of them, pursuant to California long arm statute codified in Cal. Code Civ. Proc. § 410.10.  Specifically, this Court

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL)   - 7 -       BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

also has personal jurisdiction over Defendants because they reside or have their principal places of business in California and in this District.

25.     This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in or aimed at the State of California in connection with Defendants' unregistered offers and sales of securities in violation of Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77l, and 77o, and Sections 25110, 25503, 25504, and 25401 of the California Corporations Code; and California's false advertising and unfair competition laws.

26.     Venue is proper in the United States District Court for the Northern District of California pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (c) because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the corporate transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money by doing business here and engaging in activities having an effect in this District..

## INTRADISTRICT ASSIGNMENT

27.     Pursuant to Civil Local Rule 3-5 of the United States District Court for the Northern District of California, the San Francisco division is the proper venue because substantial part of the events or omissions, which give rise to this action has occurred in San Francisco county, where Defendants' Ripple and XRP II principal offices are located.

## BACKGROUND

28.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-27 above as if fully set forth herein.

29.     Unlike cryptocurrencies such as Bitcoin and Ethereum, which are mined by those validating transactions on their networks, all 100 billion XRP were created out of thin air by Ripple in 2013, prior to its distribution to investors and without any functionality. Twenty billion XRP, or 20 percent of the total XRP supply, were given to the individual founders of Ripple. Founders Chris Larsen and Jed McCaleb each received 9.5 billion XRP, while Arthur Britto received 1 billion XRP.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL)  - 8 -      BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

30.     Ripple retained the remaining 80 billion XRP, which it planned to sell to fund company operations and to improve and promote the XRP Ledger.

31.     Ripple's own wiki states that "Ripple Labs sells XRP to fund its operations and promote the network. This allows Ripple to have a spectacularly skilled team to develop and promote the Ripple protocol and network."

32.     In May 2015, regulatory authorities in the United States fined Ripple and XRP II $700,000 for violating the Bank Secrecy Act by selling XRP without obtaining the required authorization. As part of that settlement, Defendants acknowledged that they had sold XRP and agreed to a number of remedial measures, including registration with FinCEN.

33.     From December 2014 to July 2015, Ripple disclosed on its website the amount of XRP it held and the amount in circulation. The disclosure for June 30, 2015 stated that Ripple held approximately 67.51 billion XRP, more than double the approximately 32.49 billion XRP held by all others. The XRP held by others also significantly overstates independent holdings of XRP because it includes the 20 billion provided to founders and an undisclosed amount of XRP used in "business development agreements that are still pending."

34.     Ripple's Project Manager for Risk and Compliance, Rebecca Schwartz, conceded this in a May 14, 2015 affidavit, stating: "The 9 billion XRP initially retained by Mr. McCaleb is included in the roughly 32 billion XRP that is available to the market."

**Defendants' Primary Source of Income Is the Sales of XRP**

35.     While Ripple sells and publicly touts its enterprise software products and solutions, including xCurrent, xRapid, and xVia (collectively, "Ripple Enterprise Solutions"), Ripple's primary source of income is the sales of XRP.

36.     Ripple's Chief Technology Officer, David Schwartz, has conceded "[a]s a corporation, we are legally obligated to maximize shareholder value. With our current business model, that means acting to increase the value and liquidity of XRP. We believe this will happen if the Ripple network is widely adopted as a payment system. We are pursuing multiple avenues at once. One would expect increased demand to increase price."

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL)   - 9 -      BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

37.     Defendants' sales of XRP to the public accelerated rapidly in 2017 and early 2018, and Defendants have earned over $1.1 billion dollars through the sale of XRP since May 18, 2017—XRP which costs Defendants nothing since they created it out of thin air. Defendants sell XRP wholesale to larger investors and also sell significant quantities of XRP directly to the general public on cryptocurrency exchanges starting on May 18, 2017.

38.     According to Ripple itself, in the second quarter of 2019, XRP II "sold $251.51 million XRP in Q2 2019, including $106.87 million directly to institutional investors and $144.64 in programmatic exchange sales."

39.     In the first quarter of 2019, XRP II "sold $61.93 million of XRP in institutional direct sales and $107.49 million of XRP in programmatic [exchange] sales."12

40.     In the fourth quarter of 2018, "Ripple sold $88.88 million worth of XRP, programmatically," and XRP II "sold $40.15 million worth of XRP in institutional direct sales."

41.     In the third quarter of 2018, "Ripple sold $65.27 million worth of XRP programmatically," and XRP II "sold $16.87 million XRP in direct sales."

42.     In the second quarter of 2018, "Ripple sold $56.66 million worth of XRP programmatically," and XRP II "sold $98.06 million worth of XRP in institutional direct sales."

43.     In the first quarter of 2018, "market participants purchased $16.6 million [of XRP] directly from XRP II." XRP II also "sold $151.1 million worth of XRP" on exchanges.

44.     In the fourth quarter of 2017, "market participants purchased $20.1 million directly from XRP II," and XRP II sold an additional "$71.5 million worth of XRP" on exchanges.

45.     In the third quarter of 2017, "market participants purchased $19.6 million directly from XRP II," and XRP II sold an additional "$32.6 million worth of XRP" on exchanges.

46.     The money raised through the sales of XRP substantially exceeds the amount of money needed to establish a functional network or digital asset. There is also little apparent correlation between the purchase price of XRP and the market price of any goods or services that can be acquired in exchange for XRP, which to date has not been functionally adopted nor used in any meaningful way.

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 10 -    BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

47.     Ripple and its CEO, Garlinghouse, have repeatedly claimed that XRP has utility—like currency—in its use as a "bridge currency" for international payments. For example, in an interview that was published by Forbes on October 23, 2017, Garlinghouse was asked "Why do banks need XRP" and responded "It's about liquidity. If you have a utility token like XRP that has a real value proposition."20 Similarly, in an interview with BNN, retweeted by Ripple on December 14, 2017, Garlinghouse stated: "If they [digital tokens] are solving a real problem, and that problem has scale, and that problem, you know there is real value there, then there will be demand for the tokens and the price will go up. For XRP we have seen because it's required, it's something that can really reduce the friction, and we're talking about a multi-trillion dollar problem in how cross-border payments flow. And so, I think if you drive real utility, yes there's going to be demand for that." In a December 27, 2017 interview with CNBC, Garlinghouse once again stated "we use XRP to settle liquidity between banks."

48.     Similarly, in a February 14, 2015 Submission to the Conference of State Bank Supervisors, submitted by Ripple's Chief Compliance Officer Karen Gifford, Ripple claimed that it "is designed to be used directly by (1) banks and financial services business, (2) payment networks, and (3) liquidity providers." In that same Submission, Ripple stated that "it holds a substantial amount of XRP, which it sells from time to time, to financial institutions and entities seeking to be market makers. Through these sales, Ripple Labs is able to monetize these assets to fund its operations, specifically the development and adoption of the protocol." Ripple posted this submission on its website and publicized it through its Ripple Insights blog.

49.     However, as discussed above, more than 60 percent of XRP is owned by Ripple and none of that XRP is used for anything at all, other than to be sold in the future to investors. Moreover, as for the XRP that was already sold or otherwise distributed by Defendants, the vast majority, if not all, of it is not used for bridging international transactions, but for investment purpose. Accordingly, Defendants' claims that XRP has a utilitarian purpose are false and were false when made. These claims also omitted material information regarding XRP's lack of utility that was within exclusive or superior knowledge of Defendants. These claims are

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 11 -     BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

misrepresentations and omissions of material facts to investors because the utility of XRP (or lack

thereof) is pertinent to the value of XRP. Simply stated, these false claims about XRP's utility are

nothing but an attempt to avoid the application of securities laws and drive demand for XRP.

**Defendants Market XRP to Drive Demand and Increase Price**

50.     Given its reliance on sales of XRP, it is unsurprising that Ripple aggressively

markets XRP to prospective purchasers, including Plaintiff, to drive demand, increase XRP's

price, and thus its own profits.

51.     Ripple has an entire section of its website dedicated to providing advice on "How

to Buy XRP." This section provides links to exchanges and instructions on "how to buy XRP" on

those exchanges. It also has a section titled "Market Performance" which proclaims that Ripple is

"committed to the long term health and stability of XRP markets."

52.     Ripple also consistently promotes the availability of XRP on exchanges. For

example, on May 18, 2017, Ripple's Senior Vice-President of Business Development, Patrick

Griffin, tweeted a link to the Kraken exchange with the caption: "Kraken Introduces New Fiat

Pairs for XRP Trading! USD, JPY, CAD, EUR @Ripple."

53.     Similarly, on or about December 21, 2017, Ripple tweeted in Japanese that XRP

was now available on over 50 exchanges.  That tweet linked to an article on Ripple's website

which described XRP as "the fastest and most scalable [digital] asset on the market."  It

continued, "[t]he market is taking notice of XRP's speed, reliability and scalability — which has

strengthened the demand for XRP and where it's listed. In fact, we're proud to announce that

XRP has gone from being listed on six exchanges earlier this year to more than 50 worldwide."

The article also linked to a number of exchanges where XRP could be purchased, and stated that

"XRP's long-term value is determined by its utility—including its ability to help financial

institutions source liquidity for payments into and out of emerging markets."

54.     Ripple's representation that "XRP's long-term value is determined by its utility—

including its ability to help financial institutions source liquidity for payments into and out of

emerging markets," was misleading when made because demand for XRP from financial

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 12 -    BMA LLC v. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-CV-3022

institutions did not represent a significant portion of the demand for XRP and little, if any, XRP was used to "help financial institutions source liquidity for payments into and out of emerging markets." Ripple made this misleading representation to retail investors in order to drive demand for XRP. As explained above, the utility of XRP and its adoption (or lack thereof) are pertinent to the value of XRP and are thus material to investors. Defendants also omitted material information within their exclusive or superior knowledge regarding the utility of XRP and its adoption. Accordingly, this statement was a misrepresentation and omission of material fact to investors.

55.     Ripple also hosts conferences to generate interest in XRP. For example, between October 16 and October 18, 2017, it hosted a conference named "Swell" in Toronto. Ripple acknowledged that "[a]nticipation around the event spurred a meaningful spike in XRP, pushing it up 100 percent . . ."

56.     On that same day, CoinDesk, a subsidiary of Digital Currency Group, which has an ownership interest in Ripple, published an article titled, "Ripple Price Passes Historic $1 Milestone." This was just one of many instances in which Ripple would promote XRP price movements.

57.     Ripple's promotion of XRP's price reached new highs in December 2017. In one instance, Ripple's XRP product manager retweeted a tweet exclaiming: "Wow, XRP at all time high! Forget about bitcoin, we're all in on XRP!" (emphasis added).

58.     Ripple's CEO, Brad Garlinghouse, has also been a vocal advocate for investing in XRP.

59.     In a December 14, 2017 interview with BNN, when asked if he is personally invested in XRP, the CEO stated "I'm long XRP, I'm very, very long XRP as a percentage of my personal balance sheet."34 He continued, stating that he is "not long on some of the other [digital] assets, because it is not clear to me what's the real utility, what problem are they really solving." He ended by reiterating, "if you're solving a real problem, if it's a scaled problem, then I think you have a huge opportunity to continue to grow that. We have been really fortunate obviously, I remain very, very, very long XRP, there is an expression in the industry HODL, instead of hold,

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 13 -     BMA LLC v. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-cv-3022

it's HODL . . . I'm on the HODL side." (emphasis added). HODL is a cryptocurrency meme, meaning to hold an asset for long term gains.

60.    Garlinghouse's representation that he remained "very, very, very long XRP" and was "on the HODL side"—holding XRP for long term gains—was false when made as throughout 2017 Garlinghouse sold millions of XRP on various cryptocurrency exchanges. Review of the XRP ledger indicates that Garlinghouse sold at least 67 million XRP in 2017 and that he sold any XRP he received from Ripple within days of such receipt. Garlinghouse was not "long XRP" or holding for long term gains. Rather, he was dumping XRP on retail investors in exchange for dollars and other cryptocurrency. Defendants had exclusive or superior knowledge of material information regarding Garlinghouse's XRP sales, but omitted it from their representations to investors. Had investors known the truth about Garlinghouse's sales of XRP, it would have significantly altered the total mix of information made available to them. Accordingly, Garlinghouse's statement was a misrepresentation and omission of material fact to investors.

61.    Later that same day, Garlinghouse tweeted: "Bloomberg welcomes $XRP to @theterminal and gets it right - #2 market cap behind $BTC at ~$80BB!"

62.    About a week later, on or about December 22, 2017, Garlinghouse tweeted an article titled, "*Bitcoin Is So 2017 as Ripple Soars at Year End*," with the caption, "I'll let the headline speak for itself. $xrp."

63.    On or about January 17, 2018, Garlinghouse tweeted a CNBC article titled, "*Ripple is sitting on close to $80 billion and could cash out hundreds of millions per month – but it isn't*," with the caption, "A good read on why fostering a healthy $XRP ecosystem is a top priority at @Ripple."

64.    However, the reality was that Ripple was doing exactly the opposite of what CNBC reported and sold—or "cashed out"—hundreds of millions of XRP tokens per month. As laid out in Section IV(B), Defendants issued and sold at least $167.7 million worth of XRP between January 1, 2018 and March 31, 2018. Based on the volume of XRP traded and the

market price for XRP during this timeframe, it is likely that Ripple sold over one hundred million dollars' worth of XRP during the month preceding January 17, 2018. Moreover, even if this statement were literally true, it was still misleading as it created the false impression that Ripple was not cashing out significant amounts of XRP. Significantly, this statement was unaccompanied by any qualifying language indicating that Ripple was selling tens of millions of dollars of XRP per month or hundreds of millions of dollars of XRP per quarter. Defendants had exclusive or superior knowledge of material information regarding Ripple's XRP sales, but omitted it from their representations to investors. Had investors known the truth about Ripple's sales of XRP, it would have significantly altered the total mix of information made available to them. Accordingly, this statement was a misrepresentation and omission of material fact to investors.

65.     Recently, Defendants' efforts to aggressively market and drive demand for XRP have bled into politics. In September 2018, Ripple and several other cryptocurrency companies with links to Ripple announced the founding of an advocacy group dubbed "Securing America's Internet of Value Coalition." The Coalition announced that it had retained the Klein/Johnson Group, a prominent Washington D.C. based lobbying firm, who is expected to help the Coalition in its efforts to lobby Congress and the SEC on issues critical to Ripple's bottom-line, including whether XRP is a security subject to SEC regulation. For their expertise, the Klein/Johnson Group will receive $25,000 and 10,000 XRP tokens per month from the Coalition. Commenting on the decision to pay their lobbyists in XRP, Chris Larsen, explained: "It gives them some upside and gives them some risk . . . Hopefully it gives them a taste of the industry in a way that hits home."

**Defendants Blur Differences Between Ripple's Enterprise Solutions and XRP to Further Drive Demand**

66.     Defendants' advertising and social media postings also conflate adoption and use of Ripple Enterprise Solutions, such as xCurrent and xVia, with adoption and use of XRP, even though they often have little to no correlation. As one industry publication noted, most of

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 15 -     BMA LLC V. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-CV-3022

Ripple's product and partnership announcements "don't have much to do with XRP."  Defendants conflate statements regarding their other financial products with statements regarding XRP in a calculated scheme to drive demand for XRP and thereby maximize profits from XRP sales.

67.     According to the Ripple website, "xCurrent is Ripple's enterprise software solution that enables banks to instantly settle cross-border payments with end-to-end tracking. Using xCurrent, banks message each other in real-time to confirm payment details prior to initiating the transaction and to confirm delivery once it settles."

68.     xCurrent does not operate on the same technology as XRP or even require the use of XRP. In short, there is no reason to believe that adoption of xCurrent would correlate in any way with adoption of XRP.

69.     Nor does use of Ripple's xVia product require adoption of XRP. Ripple states that its xVia product is "for corporates, payment providers and banks who want to send payments across various networks using a standard interface."

70.     Ripple nevertheless conflates the adoption of these Enterprise Solutions with adoption of XRP.

71.     For example, on March 20, 2017, Ripple retweeted a Bloomberg article regarding adoption of Ripple Enterprise Solutions, proclaiming, "Ripple is the only company in this space with real customers who are really in production."

72.     The price of XRP increased rapidly following this tweet and on March 24, 2017, Ripple tweeted: "The price of #XRP continues to surge showing that people are looking for #bitcoin alternatives."

73.     On April 26, 2017, Ripple tweeted a link to an article on its own site, proclaiming: "#Ripple welcomes 10 additional customers to our #blockchain #payments network."  Neither this tweet nor the article it linked to informed readers that the blockchain payments network did not refer to the XRP Ledger, but rather Ripple's xCurrent enterprise solution.

74.     Just days later, on May 3, 2017, with the price of XRP continuing to rise, Ripple tweeted: "#Ripple adoption is sparking interest in XRP 'which has had an impressive rally in the

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 16 -     BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

last two months' via @Nasdaq."

75.     Ripple conflated the adoption of its Enterprise Solutions and XRP again on May 16, 2017, tweeting: "The appeal that Ripple has towards traditional financial institutions is a big advantage it has over Bitcoin."

76.     On June 29, 2017, Ripple tweeted a clip of an interview its CEO Brad Garlinghouse gave on CNBC with the caption: "#XRP – up 4000% this year – has shown the market favors a real use case for #digitalassets . . ." In that interview, Garlinghouse proclaimed that "digital assets are in a position to be more valuable than gold," and described XRP as "solving a real-world use case, it's not just about speculators."

77.     On September 11, 2017, Garlinghouse stated in an interview with CNBC: "People are looking at the success Ripple has been having as a company, ***and I think that's increased the value of XRP***." (emphasis added). He continued by stating that Ripple wanted "to keep focusing on making XRP a valuable payments tool, and that value will increase accordingly," and he was "voting with [his] . . . pocketbook on the future increased value of cryptocurrencies."

78.     On November 27, 2017, Garlinghouse tweeted "Ripple & $XRP are giving businesses 'what they want in a #blockchain,'" along with a link to a Motley Fool tweet. That Motley Fool tweet in turn stated that "AmEx and Banco Santander will use Ripple's blockchain network for instant intl. fund transfers. ***Could be a big deal for Ripple's XRP cryptocurrency***. $AXP $SAN." (emphasis added).

79.     Similarly, on December 14, 2017 Ripple tweeted: "The Japan Bank Consortium launched a Ripple pilot with two large Korean banks – the first time money moves from Japan to Korea over Ripple Net." The tweet also linked to an article on Ripple's site. Buried inside that article is the fact that "RippleNet" refers to Ripple's xCurrent enterprise solution, which does not require use of XRP.  Nevertheless, earlier on that day, Ripple tweeted "@bgarlinghouse [its CEO's twitter handle] on why crypto prices will be driven by real utility, the multi-trillion $ problem @Ripple is solving and why $XRP will come out on top."

80.     Ripple would later acknowledge that "neither the AMEX news nor the Korean

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 17 -     BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

bank initiative involved XRP."

81.     Nevertheless, the December 14, 2017 Ripple tweet linked to a BNN interview with Mr. Garlinghouse, in which he said "the reason why XRP has performed so well this year, we're solving a real problem, it's a multi-trillion dollar problem around cross-border payments. There is a lot of friction it's very slow it's expensive, we're working with the institutions to deal with that, so people have gotten excited. We now have over 100 customers we've announced publicly."

82.     Although few, if any of those 100 customers were using XRP, Garlinghouse continued, "at the end of the day the value of digital assets will be driven by their utility. If they are solving a real problem, and that problem has scale, and that problem, you know there is real value there, then there will be demand for the tokens and the price will go up. For XRP we have seen because ***it's required***, it's something that can really reduce the friction, and we're talking about a multi-trillion dollar problem in how cross-border payments flow. And so, I think if you drive real utility, yes there's going to be demand for that." "***XRP is up 100x this year***, and I think it's ***because the problem we are solving people realize is a real problem, it's a big problem***."

83.     The statements in the above paragraphs falsely conflate adoption of Ripple Enterprise Solutions with adoption and use of XRP. These statements create an impression that adoption of Ripple Enterprise Solutions by financial institutions will drive demand for XRP and thereby allow investors to profit by holding XRP. Ripple and its CEO Garlinghouse repeatedly tied Ripple's Enterprise Solutions customers with the proposition that "the value of digital assets will be driven by utility" and that the price of XRP was appreciating and would continue to appreciate because XRP was solving a real problem for those customers. However, few, if any, of those customers were actually using XRP. Defendants had exclusive or superior knowledge about use and utility of XRP (or lack thereof), but omitted this information from their representations to investors. Had investors known the truth, it would have significantly altered the total mix of information made available to them. Accordingly, these statements were misrepresentations and omissions of material facts to investors.

84.     On January 4, 2018, following XRP's rapid price increase, the New York Times

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 18 -     BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-cv-3022

published an article by Nathaniel Popper titled, "*Rise of Bitcoin Competitor Ripple Creates Wealth to Rival Zuckerberg*." Mr. Popper tweeted a link to this article with the caption: "On the rise of Ripple. If this is a tulip fever, the fever has spread to chrysanthemums and poppies."

85.    He further commented, "I've asked several people close to banks if banks are indeed planning to begin using Ripple's token, XRP, in a serious way, which is what investors seem to assume when they buy in at the current XRP prices. This is a sampling of what I heard back:

      a.  Actual use of XRP by banks is not something I've heard about, I find the run up absolutely baffling, as do all the blockchain folks I know at large FIs.

      b.  XRP isn't used for anything. The hope is that some day it will be by banks, but there really aren't banks signaling that yet.

      c.  I would be surprised if there have been any real bank to bank transactions done with it (outside of maybe test transactions), despite people making claims to the contrary.

      d.  It's not clear to me why XRP would be used by banks at all. XRP could potentially be adopted by consumers as a payment rail, although they don't yet have meaningful traction in that regard.

      e.  I haven't seen a sufficiently large catalyst in the fundamentals of Ripple to justify a greater than 10x move in the price of $XRP in the last month.

      f.  In a few years we're going to look back on 2017 and think WTF were we thinking."

86.    Ripple's CEO Garlinghouse publicly responded to this, tweeting: "Over the last few months I've spoken with ACTUAL banks and payment providers. They are indeed planning to use xRapid (our XRP liquidity product) in a serious way. . ." He followed up stating, "I don't think you want to hear about validation for XRP. The @NYTimes should be above spreading anonymous FUD." FUD, which stands for fear, uncertainty, and doubt, is an expression frequently used among crypto-investors to deride or undermine criticism of an asset.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 19 -    BMA LLC v. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-cv-3022

87. Ripple's XRP product manager also attacked Mr. Popper, tweeting: "Do you think I left #Bitcoin and joined @Ripple to build bank software? Think again. $XRP." This tweet linked to a Ripple's tweet stating that "3 of the top 5 global money transfer companies plan to use XRP in payment flows in 2018. Even more in the pipeline."

88. Despite publicly claiming that use of XRP by banks and financial institutions will drive demand for XRP, Defendants sell XRP primarily to retail investors, and not banks or financial institutions.

**Defendants Offer to Pay Exchanges to List XRP**

89. Illustrative of Defendants' attempts to promote XRP, in 2017, Ripple attempted to pay two U.S. cryptocurrency exchanges to list XRP to further drive demand for the token and to make XRP more easily available to a larger audience. Coinbase and Gemini provide the easiest ways for U.S.-customers to buy crypto-assets with U.S. dollars. There is thus a perception that being listed on one of these exchanges will accelerate demand for, and thus the price of, a crypto-asset.

90. A listing on Coinbase, in particular, is considered to be a crypto-asset's golden ticket. This proved true when Coinbase listed Litecoin in August 2016 and Bitcoin Cash in December 2017. As an example, when Coinbase agreed to list Bitcoin Cash, its price increased from approximately $2,500 to approximately $3,400 just before Coinbase listed the asset. The price then briefly shot up to $9,500 upon Bitcoin Cash's being listed on Coinbase before Coinbase temporarily halted trading.

91. Recognizing that getting its XRP listed on these exchanges could spur demand for XRP, and thereby allow it to maximize the profits it derives from XRP sales, Ripple offered to pay each of these exchanges to list XRP.

92. Bloomberg reported that "a Ripple executive asked whether a $1 million cash payment could persuade Gemini to list XRP in the third quarter" of 2017.

93. Ripple also "said it would be willing to lend [Coinbase] more than $100 million worth of XRP to start letting users trade the asset. . . ." Gemini and Coinbase both declined to

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 20 -   BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-cv-3022

pursue Ripple's proposal at that time.

94.     On November 29, 2017, Ripple posted a link to a change.org petition to "Get Ripple on Coinbase," with the caption "[t]he community is mobilizing! [thumbs up emoji]." Ripple's Senior Vice President of Business Development also tweeted a link to the petition.

95.     Weeks later, on December 13, 2017, Ripple's Senior Vice President of Business Development retweeted a tweet from Arrington XRP Capital (a hedge fund valued in XRP) stating: "It's stunning that coinbase hasn't added XRP yet."

96.     During this same late-2017 and early-2018 time period, rumors that XRP would be added to Coinbase fueled a massive price increase. Defendants were the source of these rumors.

**Ripple Publicly Limits the Supply of XRP to Drive Price Appreciation**

97.     In mid May 2017, Ripple publicly announced that it would limit distribution of the remaining 61.68 billion XRP owned by the company, from its original allotment of 80 billion XRP. Ripple stated that it would place 55 billion XRP in a cryptographically secured escrow account, and only offer and sell limited amounts of XRP at defined intervals. It established 55 contracts of 1 billion XRP each that allowed it to sell up to 1 billion XRP per month, with any unsold XRP returned to escrow for use in subsequent offerings.

98.     On or about May 16, 2017, Ripple's CEO posted an article on its website, titled "Ripple to Place 55 Billion XRP in Escrow to Ensure Certainty of Total XRP Supply." Ripple promoted this article in a tweet stating: "We're placing 55B #XRP into a cryptographically secured escrow account to establish certainty around #XRP supply."

99.     In that article, Garlinghouse proclaimed, "Our goal in distributing XRP is to incentivize actions that build trust, utility and liquidity. We engage in distribution strategies that we expect will result in a ***strengthening XRP exchange rate*** against other currencies." (emphasis added). He continued, noting that "we have heard concerns in the market about uncertainty surrounding our ongoing XRP distribution. The root of this uncertainty is the notion that Ripple might one day sell its 61.68B XRP in the market at any time – a scenario that would be bad for Ripple! Our self-interest is aligned with building and maintaining a healthy XRP market."

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 21 -     BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE No. 3:20-cv-3022

100.    He committed to remove "that uncertainty by committing to place 55 billion XRP into a cryptographically-secured escrow account," which will allow investors to "mathematically verify the maximum supply of XRP that can enter the market." He ended by stating that "XRP is the only digital asset with a clear use case . . . Designed for enterprise use, XRP can be used by financial institutions for on-demand liquidity for cross-border payments. Payment providers and banks using XRP will gain greater access to emerging markets and much lower settlement costs, and this is why we remain committed to increasing XRP liquidity and continued decentralization of its ledger."

101.    XRP's price increased rapidly following this announcement, and Ripple's "Q2 2017 XRP Markets Report" listed the May 16, 2017 escrow announcement as "instrumental in helping to drive XRP interest and volume," and noted that the "market responded favorably to the escrow" announcement.

102.    On or about December 7, 2017, Ripple announced that it had followed through with its promise and placed "55 billion XRP in a cryptographically-secured escrow account to create certainty of XRP supply at any given time."

103.    It published an article detailing this escrow, which explained, "[b]y securing the lion's share of XRP in escrow, people can now mathematically verify the maximum supply that can enter the market. While Ripple has proved to be a responsible steward of XRP supply for almost five years – and has clearly demonstrated a tremendous track record of investing in and supporting the XRP ecosystem – *this lockup eliminates any concern that Ripple could flood the market, which we've pointed out before is a scenario that would be bad for Ripple*!"

104.    The article contained a button to allow readers to share it on Twitter with the caption, "Game changer for $XRP! 55 billion XRP now in escrow." Ripple also promoted this article through its own tweet, which proclaimed: "55B $XRP is now in escrow. Interested in what this means for $XRP markets?"70 Ripple's CEO was even more enthusiastic, tweeting: "Boom! 55B $XRP now in escrow. Good for supply predictability and trusted, healthy $XRP markets. Glad to finally let this #cryptokitty out of the bag!"

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 22 -    BMA LLC v. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-cv-3022

105.    Ripple's public commitment to limit the supply of XRP had its intended effect. In the weeks that followed, the price of XRP exploded upwards, from approximately 25 cents on December 7, 2017 to $3.43 on January 3, 2018.

106.    Ripple explains its escrow mechanism as follows:

> a.   The recently launched Escrow feature in XRP Ledger allows parties to secure XRP for an allotted amount of time or until specific conditions are met. For example, Escrow allows a sender of XRP to put conditions on exactly when a payment can be completed, so the payment remains cryptographically locked until the due date.

> b.   We'll use Escrow to establish 55 contracts of 1 billion XRP each that will expire on the first day of every month from months 0 to 54. As each contract expires, the XRP will become available for Ripple's use. You can expect us to continue to use XRP for incentives to market makers who offer tighter spreads for payments and selling XRP to institutional investors.

107.    In other words, every month for 55 months, Ripple obtains from its cryptographic escrow access to a new block of 1 billion XRP, some or all of which it can sell—during that month only—in a separate offering. Any unsold XRP during any given month go into the back of the line in the Escrow to be available to Ripple to sell in separate offerings after the first 55 months.

## Defendants' Maintain that XRP is Not a Security

108.    Defendants made numerous statements to the public claiming that XRP is not a security to prop up demand and its value.

109.    For example, on approximately April 11, 2018, Ripple's Chief Market Strategist, Cory Johnson, told CNBC: "We absolutely are not a security. We don't meet the standards for what a security is based on the history of court law." Mr. Johnson also said, "Coinbase never ever raised the issue of whether or not XRP is a security in our discussions about listing XRP. We're 100 percent clear, it's not a security. We don't meet the standards."

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL)  - 23 -     BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE No. 3:20-CV-3022

110.    Ripple's CEO Defendant Garlinghouse made similar comments, claiming XRP is not a security, to the public through a variety of avenues and media channels, including at the CB Insights Future of Fintech, live-streamed by Yahoo Finance.

### Development Of The XRP Ledger And The Success of XRP
### Are Dependent On Defendants' Efforts

111.    The development of the XRP Ledger and the success of XRP are dependent on Defendants' technical, entrepreneurial, and managerial efforts.

112.    For example, in February 2017, Ripple promoted a deal with BitGo to build an enterprise wallet and treasury management platform for XRP.

113.    Ripple also publishes a quarterly report detailing its efforts to grow the "XRP ecosystem." In one of these reports, discussing its plan for "Q3 2017," Ripple states that it "plans to focus on three areas of liquidity development as we drive XRP towards its natural position as the digital asset standard for international value transfer." Ripple ends by saying, "[m]ost importantly, we are accelerating the pace of ***our investment*** in the XRP Ledger to ***build on its speed, uptime, and scalability, to ensure XRP is the most trusted enterprise-grade digital asset***." (emphases added).

114.    Three months later, in describing its goals for the fourth quarter of 2017, Ripple proclaimed it would "continue to expand [its] xRapid partnerships." It states that its "long-term goal is, and always has been, usage of XRP as a liquidity solution for more and more corridors, and partnerships are key to achieving this goal."

115.    In January 2018, Ripple touted "a partnership with MoneyGram—one of the world's largest money transfer companies—to use xRapid and XRP for near real-time cross-border payments. In addition, there are a number of other xRapid deals at various stages of completion in the pipeline." It also stated that it wanted "to build the necessary markets infrastructure for eventual direct usage of XRP by financial institutions."

116.    Ripple's CEO commented on this partnership, stating: "And to be clear: @MoneyGram announcement is one step in a marathon ahead to truly make $XRP the global

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 24 -    BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE No. 3:20-cv-3022

liquidity solution for payment providers and banks."

117.    Ripple has also used XRP to enter into partnerships intended to drive the adoption of XRP, and even structured these agreements so that their partner's compensation is tied to appreciation of XRP—just as companies often do with shares to ensure that their interests are aligned. In early 2016, Ripple promised R3 Holdco, LLC ("R3"), an enterprise software firm with a network of banks and financial institutions, the option to purchase 5 billion XRP in exchange for R3 providing Ripple with access to R3's consortium of member banks and financial institutions—thereby driving adoption of XRP.

118.    When the price of XRP rose rapidly, Ripple repudiated the deal, which had provided R3 the option to purchase 5 billion XRP at $0.085 per XRP. Ripple claimed that R3 failed to commercialize Ripple's technology in connection with the use of XRP as the parties had agreed.

### Ripple Updates XRP

119.    Defendants, and Ripple in particular, are also entirely responsible for updating and maintaining the XRP Ledger.

120.    Unlike cryptocurrencies such as Bitcoin and Ethereum, which use a Proof of Work ("PoW") consensus mechanism to verify the legitimacy of transactions on the network, the XRP Ledger relies on trusted nodes operated by Ripple to verify the legitimacy of transactions and maintain agreement on the network. The PoW mechanism utilized by Bitcoin and Ethereum helps to ensure the network is decentralized by allowing anyone to use their own hardware and electricity to run the PoW consensus algorithm to verify transactions on the public ledger and send them to be recorded throughout the blockchain. The network's decision-making process is thus placed entirely in the hands of those who run the consensus algorithm with their own hardware and electricity, rather than being centralized in any one entity or individual. Bitcoin currently has approximately 9,933 public nodes, while Ethereum has 18,266.

121.    The XRP Ledger consensus protocol, on the other hand, relies almost entirely on "trusted nodes" on the Unique Node Lists ("UNL"). The UNL is the set of trusted nodes that

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

communicate "reliable" information to other nodes on the XRP Ledger. Like miners in Bitcoin and Ethereum, these "trusted nodes" validate transactions. However, unlike those miners, the trusted nodes are either selected or controlled by Ripple itself. Ripple provides its own default and recommended UNL—currently comprised of only five Ripple-hosted nodes. Although Ripple claims it plans someday in the future to eventually decentralize the network, it admits that it will only remove its own "trusted nodes" if it decides that other validator nodes are reliable, reputable, stable, and secure.81 Ripple's view of potential decentralization of the XRP Ledger still involves Ripple maintaining full control over the Ledger and deciding who owns and operates any third-party "trusted nodes."

122.   In January 2018, BitMex Research, a blockchain research group, installed and ran a copy of Rippled, the software that allows users to run nodes on the XRP Ledger.  "The node operated by downloading a list of five public keys from the server v1.ripple.com." "The software indicates that four of the five keys are required to support a proposal in order for it to be accepted [on the XRP Ledger]." However, "[a]ll five keys are assigned to Ripple.com." BitMex Research concludes that "[s]ince the keys were all downloaded from the Ripple.com server, ***Ripple is essentially in complete control of moving the ledger forward***, so one could say ***the system is centralized***." (emphasis added).

123.   BitMex Research continues, "the Ripple system appears for all practical purposes to be centralized and is therefore perhaps devoid of any interesting technical characteristics, such as censorship resistance, which coins like Bitcoin may have. . . ."

124.   Ripple is also constantly changing and seeking to improve the XRP network. These changes have decreased transaction times and improved system security, compatibility, use cases and other features of XRP. At the same time, Ripple has released new "white papers" touting these upgrades and proposed upgrades to the cryptocurrency and its exchange network. For example, Ripple released a white paper in February 2016 following a series of upgrades with the subtitle, "The ROI of Using Ripple and XRP for Global Interbank Settlements."  ROI stands for "return on investment," and the paper discussed at length the purported value of using XRP,

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 26 -   BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-cv-3022

1   compared to other systems.

2   125.   In May 2015, U.S. regulatory authorities fined Ripple and XRP II $700,000 for

3   "willfully" violating the Bank Secrecy Act by selling XRP without obtaining the required

4   authorization. The failure to properly register as a money services business, or "MSB," exposed

5   XRP for use by money launderers and criminals. As part of the settlement, Ripple and XRP II

6   agreed to a number of remedial measures, including registration with FinCEN within 30 days of

7   the agreement and to secure customer identification information within 180 days of the

8   agreement. In the subsequent months, Ripple updated the XRP network and ecosystem to attempt

9   to comply with the settlement agreement. In October 2015, Ripple underwent a rebranding after

10   which it purported to fulfill its obligations under the settlement agreement.

11   126.   Ripple's own XRP product manager, Warren Paul Anderson, frequently markets

12   the XRP Ledger's dependence on Ripple's continued commitment to it. For example. on

13   December 14, 2016, he tweeted: "Thrilled to have the rippled team in town for a summit to

14   discuss the future of @Ripple Consensus Ledger & XRP as a native digital asset!"84

15   Approximately one year later, in December 2017, he retweeted his own tweet, saying, "It's that

16   time of year again, and what a year its been! #XRP Ledger (rippled) core developers in town

17   @Ripple for a summit to discuss planning for 2018."

18   127.   Later that same day he posted a picture of Ripple engineers with the caption, "A

19   great day of reflection & planning @Ripple w/ the greatest C++ engineering team in the world

20   #XRP."

21   128.   On that same day, Ripple's head of cryptography tweeted: "Today, all the $XRP

22   Ledger developers at @Ripple are in SF to reflect on 2017 and plan for 2018."

23   129.   Later in the month, on December 29, 2017, a Ripple software engineer, Nik

24   Bougalis, tweeted: "I've been working on code review for the last couple days. Excited to get

25   rippled 0.90.0 out the door," indicating that Ripple was working to release a new version of

26   Rippled to further advance the XRP Ledger.

27   130.   On January 9, 2018, Anderson tacitly admits that the XRP Ledger remains

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 27 -    BMA LLC v. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-cv-3022

centralized, tweeting that the "[n]ew $XRP Ledger (rippled) 0.81.0 release gets us one-step closer to executing on our aforementioned decentralization strategy. . ."

131.    Following, Ripple's release of a Rippled upgrade, Bougalis tweeted, "[t]he C++ team has released rippled 0.90.0. Cool new features: history sharding, deposit authorizations, checks and more!"90 When asked about Rippled, Bougalis continues, "[i]t's the software one uses to run a server that connects to the XRP Ledger."

132.    On March 5, 2015, Bougalis similarly reposted a tweet defending investing in XRP by stating: "So you'd invest in Linux, not Microsoft. In UseNet, not Google. In MySQL, not Oracle. Good luck with your portfolio. Ripple is the next Google. You're stuck in the silly idea that a company can't build a digital asset, even when it does this right under your nose," with the caption, "[n]ow that's a mic drop, if I've ever seen one." (emphasis added).

133.    Ripple also owns and maintains the page at github.com/ripple/rippled, a Git repository used to update the XRP Ledger, and one location where Rippled can be downloaded.

134.    Ripple also pays bounties to those who identify bugs in their software, stating that "we are very generous with the bug bounties we pay. Anyone that found and responsibly disclosed such a bug would get a significant reward."

**XRP Is A Security**

135.    The SEC Framework provides guidance for analyzing whether a digital asset has the of one particular type of security—an "investment contract."

136.    As explained in the SEC Framework:

    a.   The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 28 -    BMA LLC V. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-CV-3022

circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

137.    The SEC Framework makes clear that "[w]hether a particular digital asset at the time sale satisfies the *Howey* test depends on the specific facts and circumstances." The specific facts and circumstances relating to XRP support the conclusion that XRP is a security under the *Howey* test.

138.    Purchasers who bought XRP have invested money or given valuable services to a common enterprise, Defendants. These purchasers have had a reasonable expectation of profit based upon the efforts of the promoter, Ripple, including, amongst other things, (i) Ripple's CEO's admission that "To build XRP liquidity, we have been mindful over the years about how we distribute XRP. . . . We engage in distribution strategies that we expect will result in a strengthening XRP exchange rate against other currencies," (ii) that Ripple's home page maintains metrics on the market performance of XRP and a link to buy XRP on numerous exchanges, (iii) Ripple's leadership in the development of the platform, partnering with firms to use the network and influencing significant control over which nodes can validate transactions, and (iv) the release of new white papers for the payment network, all of which contributes to the value of XRP.

### XRP Purchasers Made an Investment of Money in A Common Enterprise

139.    The SEC Framework states that, "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."

140.    Plaintiff invested fiat and other digital currencies, such as Bitcoin and Ethereum, to purchase XRP. As explained in the SEC Framework, investment of both fiat and digital

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 29 -    BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-cv-3022

currency meets the first prong of *Howey*.

141.    Defendants concede that they sell XRP tokens to the general public through cryptocurrency exchanges starting on May 18, 2017.

142.    The profits of each investor in XRP are inextricably intertwined with those of all other purchasers because XRP is fungible. As Defendants note, it can be bought or sold on over 50 exchanges.

143.    The SEC Framework states that "[i]n evaluating digital assets, we have found that a 'common enterprise' typically exists."95 The SEC Framework also elaborates: "Based on our experiences to date, investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

144.    XRP is no exception to the SEC Framework's observation regarding the "common enterprise" element of the *Howey* test. The prospective profits of Plaintiff, if any, are intertwined with the fortunes of Ripple. Ripple concedes that it "sells XRP to fund its operations and promote the network. This allows Ripple to have a spectacularly skilled team to develop and promote the Ripple protocol and network."

145.    Ripple's CEO has conceded that, "Our self-interest is aligned with building and maintaining a healthy XRP market."

146.    As further explained in Section IV(E), the price of XRP is dependent on development and adoption of the XRP Ledger, which in turn is dependent upon the efforts of Defendants and their employees or agents.

**Defendants Led Investors to Reasonably Expect a Profit from Their Investment**

147.    With respect to the element of "reasonable expectation of profits," the SEC Framework states that "[a] purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

148.    Investors in XRP, including Plaintiff, made their investment with a reasonable

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 30 -     BMA LLC v. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-cv-3022

expectation of profits.

149.    Defendants themselves have recognized that XRP investors have a reasonable expectation of profit, and publicly touted XRP's price performance on numerous occasions. Ripple's website even contains an "XRP Buying Guide" that provides links to exchanges and instructions on "how to buy XRP" on those exchanges.

150.    Ripple's CEO has publicly touted that he himself is "***very, very, very long XRP***," and criticized journalists who suggest that enterprise adoption of XRP may not be as high as Ripple indicates.

151.    Ripple also directly controls the inflation rate of XRP, going so far as to lock more than half the supply of XRP in escrow to provide "supply predictability and trusted, healthy $XRP markets." This announcement had its intended effect, driving the price of XRP rapidly upwards.

152.    Defendants also pooled XRP investments to fund projects that would promote "the XRP Ledger and Interledger Protocol," thereby increasing the value of the XRP Ledger and XRP.

153.    For example, on April 11, 2018, Ripple announced that it "had invested $25 million in XRP to Blockchain Capital Parallel IV, LP" to "support and develop additional [XRP] use cases beyond payments." Ripple's Senior Vice President of Business Development promoted this investment, tweeting, "Ripple's $25 million investment in @blockchaincap's new fund is the first and not the last contribution to ventures that further develop the #blockchain and $XRP ecosystems."

154.    The SEC Framework lays out a number of characteristics informative of whether the "reasonable expectation of profits" element is met. The SEC Framework states that "[t]he more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit." Based on the facts above, each and every characteristic identified by the SEC Framework is present in the case of XRP:

> a.    The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 31 -    BMA LLC V. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-CV-3022

b. The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.

c. The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future. Purchasers reasonably would expect that [the Defendants'] efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.

d. The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network. The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network. For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

e. There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset. There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

f. The [Defendants have] raised an amount of funds in excess of what may be needed to establish a functional network or digital asset. The [Defendants are] able to benefit from [their] efforts as a result of holding the same class of digital assets as those being distributed to the public.

g. The [Defendants] continue[] to expend funds from proceeds or operations to

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 32 -    BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

enhance the functionality or value of the network or digital asset.

h.   The digital asset is marketed, directly or indirectly, using any of the following:

  i.   The expertise of [Defendants] or [their] ability to build or grow the value of the network or digital asset.

  ii.   The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  iii.   The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

  iv.   The future (and not present) functionality of the network or digital asset, and the prospect that [the Defendants] will deliver that functionality.

  v.   The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

  vi.   The ready transferability of the digital asset is a key selling feature.

  vii.   The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

  viii.   The availability of a market for the trading of the digital asset, particularly where the [Defendants] implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

**The Success of XRP Requires Efforts of Ripple and Others**

155.   The SEC Framework explains:

"When a promoter, sponsor, or other third party (or affiliated group of third parties) (each, an "Active Participant" or "AP") provides essential managerial efforts that affect the success of the enterprise, and investors reasonably expect to derive profit from those efforts, then this prong of the test is met. Relevant to this

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 33 -     BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

1
2
3
4
5
6

inquiry is the "economic reality" of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." The inquiry, therefore, is an objective one, focused on the transaction itself and the manner in which the digital asset is offered and sold."

7
8

156.    Specifically, with respect to the element of "reliance on the efforts of others," the SEC Framework states:

9
10
11
12
13

The inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:

Does the purchaser reasonably expect to rely on the efforts of a [promoter]? Are those efforts "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," as opposed to efforts that are more ministerial in nature?

14
15
16
17
18

157.    Plaintiff and all other retail Ripple investors have entirely passive role vis-à-vis the success of the XRP Ledger and XRP. Rather, as Defendants' own marketing makes clear, the success of the XRP Ledger, and the profits Plaintiff reasonably expected to derive from investing in XRP, are dependent on the essential technical, entrepreneurial, and managerial efforts of Defendants and their agents and employees.

19
20
21

158.    The majority of XRP are tradeable in the market. All investors in XRP will profit equally if the popularity and price of XRP increase, and, other than with respect to the discount on the price paid, no investor will be entitled to a higher proportion of price increases.

22
23
24
25
26

159.    Plaintiff and all other retail Ripple investors reasonably expected Defendants to provide significant managerial efforts, to develop and improve the XRP Ledger, to develop and sustain a supportive network, and to secure exchanges through which XRP can be traded or liquidated. Defendants repeatedly represented that they would provide significant managerial efforts to achieve these objectives and make the XRP Ledger a success.

27
28

160.    Ripple created the XRP Ledger and all 100 billion XRP in circulation, and

CONSENSUS LAW CRYPTOCURRENCY ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 34 -    BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-cv-3022

concedes that it "sells XRP to fund its operations and promote the network," in order "to have a spectacularly skilled team to develop and promote the Ripple protocol and network." And as of April 22, 2018, Ripple still holds at least 60.83 billion XRP—more than 60 percent of the XRP in circulation.

161.    Although it now claims that it "didn't create XRP; 100 billion XRP was created before the company was formed," Ripple previously admitted that it "is the creator of Ripple." "We developed the protocol and its distributed payment network, and we now work to support and promote its growth." It acknowledged that "Ripple hopes to make money from XRP if the world finds the Ripple network useful and broadly adopts the protocol." Ripple further acknowledged that it "will retain a portion [of XRP] with the hope of creating a robust and liquid marketplace in order to *monetize its only asset* sometime in the future." (emphasis added).

162.    Ripple touts its control over the XRP Ledger as an advantage for XRP, contending that governance "may be where XRP most significant distinguishes itself [from Bitcoin, Ethereum, and Litecoin] going forward." "Building pivotal infrastructure on top of technology that does not have clear governance is not palatable for large established companies."

163.    Ripple also exercises near complete control over the XRP Ledger itself.  XRP Ledger bnodes operate "by downloading a list of five public keys from the server v1.ripple.com." "The software indicates that four of the five keys are required to support a proposal in order for it to be accepted [on the XRP Ledger]." However, "[a]ll five keys are assigned to Ripple.com." "Since the keys were all downloaded from the Ripple.com server, *Ripple is essentially in complete control of moving the ledger forward*, so one could say *the system is centralized*." (emphasis added). "[T]he Ripple system appears for all practical purposes to be centralized and is therefore perhaps devoid of any interesting technical characteristics, such as censorship resistance, which coins like Bitcoin may have…"

164.    Ripple and its CEO have acknowledged that the value of XRP will be driven by the XRP Ledger's usefulness in solving cross-border payments and its adoption by enterprises. Defendants have similarly touted adoption of Ripple's Enterprise Solutions, even when those

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 35 -    BMA LLC V. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-CV-3022

Enterprise Solutions do not actually utilize XRP.

165.    Ripple's CTO, David Schwartz, has similarly acknowledged that the "biggest risks" to the price of XRP are:

a.  "Someone else does almost exactly the same thing Ripple does, but does it better.  This is mitigated by the fact that Ripple has such talented people and has a lead. But you never know."

b.  "Unfavorable regulatory changes make Ripple's business model impractical. Perhaps some regulators deem XRP to be a security and therefore only salable to sophisticated investors or something like that.  This is mitigated by the fact that Ripple can target friendlier jurisdictions, but losing big ones would be damaging."

c.  "Some serious technical problem is found in the XRP ledger system and neither Ripple nor anyone else is able to fix it."

d.  "Some horrible personal or business scandal affects key Ripple people such as Chris Larsen or Brad Garlinghouse or the company itself and the company becomes too toxic for FIs [financial institutions] to do business with."

e.  "Someone comes up with a better way to bridge international payments than using a digital asset and Ripple is unable to position XRP for another use case and abandons XRP."

166.    XRP therefore derives its value from the usefulness and popularity of the XRP Ledger, which is in turn highly dependent on the significant technical, entrepreneurial, and managerial efforts of Defendants. The purchase of XRP is thus an investment in a common enterprise, with an expectation of profits, based upon the efforts of its promoter, the Defendants.

167.    The SEC Framework lays out a number of characteristics informative of whether the "reliance on the efforts of others" element is met. The SEC Framework notes that "although no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'" Based

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 36 -    BMA LLC V. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-CV-3022

on the facts above, each and every characteristic identified by the SEC Framework is present in the case of XRP:

    a.  Defendants are "responsible for the development, improvement (or enhancement), operation, or promotion of the network" and "purchasers of the digital asset expect [Defendants] to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality."

    b.  "Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale"—both true of the XRP Ledger— "purchasers would reasonably expect [Defendants] to further develop the functionality of the network or digital asset (directly or indirectly)." "This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value," as is true with Ripple.

    c.  "There are essential tasks or responsibilities performed and expected to be performed by [Defendants], rather than an unaffiliated, dispersed community of network users (commonly known as a 'decentralized' network)."

    d.  Defendants "create[] or support[] a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, 'burning,' or other activities." Defendants have "a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, [Defendants] play[] a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset."

    e.  Defendants have "a continuing managerial role in making decisions about or

exercising judgment concerning the network or the characteristics or rights the digital asset represents including:

    i.   Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

    ii.  Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on [Defendants] for liquidity, such as where the [Defendants have] arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

    iii. Determining who will receive additional digital assets and under what conditions.

    iv. Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

    v.  Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

    vi. Making other managerial judgments or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally."

f.  "Purchasers would reasonably expect [Defendants] to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:"

    i.   Defendants have "the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the [Defendants] retain[] a stake or interest in the digital asset. In these instances, purchasers would reasonably expect [Defendants] to undertake efforts to promote its own interests and enhance the value of

Consensus Law
CryptoCurrency
Attorneys

Complaint for Unregistered Offer of Securities (Jury Trial) - 38 -    BMA LLC v. Ripple Labs, Inc., et al.    Case No. 3:20-cv-3022

the network or digital asset."

ii.  Defendants "distribute the digital asset as compensation to management or [Defendants'] compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset."

iii. Defendants "own[] or control[] ownership of intellectual property rights of the network or digital asset, directly or indirectly."

iv.  Defendants "monetize[] the value of the digital asset, especially where the digital asset has limited functionality."

### XRP is a Security Under California Law

168.   California's definition of a "security" in Corp. Code § 25019 was modeled after Section 2(a)(1) of the Securities Act of 1933, and includes some 23 instruments meeting the definition, such as "any note; stock; treasury stock; . . . certificate of interest or participation in any profit-sharing agreement; . . . transferable share; [and] investment contract. . . ." Court decisions interpreting the scope of the definition of a "security" under the Securities Act of 1933 are persuasive authority under the California statute, and courts have interpreted the term "security" to be synonymous in scope with the term "investment contract" in federal securities law cases. *See* 1 Marsh & Volk, PRACTICE UNDER THE CALIFORNIA CORPORATE SECURITIES LAWS § 5.19[1][b], [d] (2019).

169.   In addition to meeting the definition of a "security" under the SEC Framework and the federal *Howey* test, XRP also satisfies the four elements of the "risk capital test" as articulated by the California Supreme Court in *Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 815 (1961) ("*Silver Hills*") to qualify as a "security" under California law.

170.   California courts have held that that both the *Silver Hills* and *Howey* tests may be applied, either separately or together, to determine whether a transaction is a security under California law—in other words, a transaction is a security if it satisfies either test. *People v.*

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 39 -    BMA LLC v. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-CV-3022

*Black*, 8 Cal. App. 5th 889, 900 (2007) (holding that California "proceed[s] under the framework of both tests, either separately or together"); *Consol. Mgmt. Grp., LLC v. Dep't of Corporations*, 162 Cal. App. 4th 598, 610 (2008) (same); *People v. Schock*, 152 Cal. App. 3d 379 (1984) (both tests applied, and transaction held to be a security under federal test); *People v. Smith*, 215 Cal. App. 3d 230, 237 (while California courts often use the risk capital test for defining a security, it is "a general test, and is not applicable in all situations. Federal definitions of securities are also used in California when appropriate in determining whether an investment vehicle is a security. . . .").

171.    In this case, Defendants attempted to raise funds for a business venture or enterprise— Ripple and the development of the XRP Ledger—through the sale of XRP to the general public through various cryptocurrency exchanges starting on May 18, 2017.

172.    Because XRP is available on cryptocurrency exchanges, Defendants' numerous issuances of XRP are indiscriminate offerings to the public at large where the persons or investors being solicited are selected at random, rather than specifically or individually targeted.

173.    As investors in XRP, Plaintiff and all other retail Ripple investors who purchased XRP maintain a passive position vis-à-vis the success of XRP and the XRP Ledger in that they are substantially powerless to affect the success of the enterprise. Any money Plaintiff and all other retail Ripple investors invested in XRP is also substantially at risk because it is inadequately secured.

174.    This is because, as Defendants' own marketing makes clear, the success of the XRP Ledger, and the profits Plaintiff and all other retail Ripple investors reasonably expected to derive from investing in XRP, are dependent on the conduct of Defendants and their agents and employees.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

175.     Defendants failed to file a registration statement even though they cannot claim any exemption to the registration requirements of the Securities Act. The exemptions for private offerings do not apply to XRP because, among other things, starting on May 18, 2017, Defendants have been offering XRP to the U.S. general public.   In addition, the Regulation S safe harbors do not apply to XRP because the offer or sale of the XRP was not made in an "offshore transaction" and further because "directed selling efforts" were made by Defendants in the United States.

176.     Because a registration statement is filed, the sale of XRP by Defendants violated the federal and California securities laws.

177.     Defendants' prior, current and future unregistered offers and sales of XRP are in violation of Section 5(a) and (c) of the Securities Act.

**COUNT I**
**Unregistered Offer and Sale of Securities in Violation of Sections 5 and 12(a)(1) of the Securities Act**
**(Against All Defendants)**

178.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-178 above as if fully set forth herein.

179.     Defendants, and each of them, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

180.     XRP are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1).

181.     Plaintiff and all other retail Ripple investors purchased XRP securities from Defendants.

182.     No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 41 -     BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

183.    By reason of the foregoing, each of the Defendants have violated Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a).

184.    As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiff has suffered damages in connection with its respective purchases of XRP securities.

**COUNT II**
**Violation of Section 15 of the Securities Act**
**(Against Ripple and Garlinghouse)**

185.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-185 above as if fully set forth herein.

186.    This Count is against Defendants Ripple Labs, Inc. and Garlinghouse.

187.    Defendants Ripple and Garlinghouse, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 15 of the Securities Act.  Defendants Ripple and Garlinghouse, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of XRP securities as described herein.

188.    Defendants Ripple and Garlinghouse, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of XRP II, through ownership of voting securities, by contract, subscription agreement, or otherwise.

189.    Defendant Garlinghouse also has the power to direct or cause the direction of the management and policies of Ripple.

190.    Defendants Ripple and Garlinghouse, separately or together, have sufficient influence to have caused XRP II and/or Ripple to submit a registration statement.

191.    Defendants Ripple and Garlinghouse, separately or together, jointly participated in, and/or aided and abetted, XRP II and/or Ripple's failure to register XRP.

192.    By virtue of the conduct alleged herein, Defendants Ripple and Garlinghouse are liable for the wrongful conduct complained of herein and are liable to Plaintiff for rescission and/or damages suffered.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 42 -    BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE No. 3:20-cv-3022

1

2
<br>

**COUNT III**

3
**Unregistered Offer and Sale of Securities in Violation of California Corporations Code Section 25110 and 25503**
**(Against All Defendants)**

4
193.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 193 above as if

5
fully set forth herein.

6
194.     XRP are securities within the meaning of the California Corporations Code.

7
195.     Defendants, and each of them, by engaging in the conduct described above within

8
California, directly or indirectly, sold and offered to sell securities.

9
196.     Plaintiff purchased XRP securities from Defendants.

10
197.     No registration statements have been filed with any state or federal government

11
entity or have been in effect with respect to any of the offerings alleged herein.

12
198.     By reason of the foregoing, each of the Defendants has violated Sections 25110

13
and 25503 of the California Corporations Code.

14
199.     As a direct and proximate result of Defendants' unregistered sale of securities,

15
Plaintiff has suffered damages in connection with their respective purchases of XRP securities.

16
**COUNT IV**
**Violation of Section 25401 of the California Corporations Code**

17
**(Against All Defendants)**

18
200.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-200 above as

19
if fully set forth herein.

20
201.     This Count is asserted against Defendants Ripple Labs, Inc. and XRP II, LLC for

21
violation of Section 25401 of the California Corporations Code.

22
202.     The Count is asserted against Defendants Ripple Labs, Inc. and Garlinghouse

23
because they materially assist, and/or aid and abet, in the violation of Section 25401, with intent

24
to deceive or defraud, pursuant to Section 25504.1.

25
203.     California Corporations Code section 25401 makes it illegal to "offer or sell a

26
security in this state . . . by means of any written or oral communications which includes an

27
untrue statement of a material fact or omits to state a material fact necessary in order to make the

28
statements made . . . not misleading."

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 43 -    BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

1

2

204.     Defendants were, at the time of the wrongs alleged herein, and as set forth herein, "persons" within the meaning of Section 25401 of the California Corporations Code.

3

4

205.     Defendants, separately or together, directly or indirectly, caused a false statement or omission to be made in connection with the offers or sales of a security. These false statements or omissions are specifically set out in above paragraphs of this Complaint.

5

6

7

206.     Defendants, separately or together, sold and offered to sell XRP, a security, in the state of California.

8

9

207.     Defendants, separately or together, had knowledge of the falsity or misleading nature of a statement or omission made in connection with the offers or sales of XRP. Alternatively, Defendants, separately or together, were negligent in failing to investigate and discover the falsity of the statement or omission.

10

11

12

13

208.     Defendants, separately or together, were aware that a fact being misrepresented or omitted was material to the buyer's decision to purchase XRP.

14

15

209.     By virtue of the conduct alleged herein, Defendants are liable, jointly or severally, for the wrongful conduct complained of herein and are liable to Plaintiff for rescission and/or damages suffered.

16

17

18

**COUNT V**
**Violation of Sections 25110 and 25504 of the California Corporations Code**
**(Against the Ripple and Garlinghouse)**

19

20

210.     Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-210 above as if fully set forth herein.

21

22

211.     This Count is asserted against Defendants Ripple and Garlinghouse under Section 25504 of the California Corporations Code.

23

24

212.     Defendants Ripple and Garlinghouse, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, and as set forth herein, controlling persons within the meaning of Section 25504 of the California Corporations Code. Defendants Ripple and Garlinghouse, and each of them, had the power and influence and exercised the same to cause the unlawful offer and sale of XRP

25

26

27

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 44 -     BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

securities as described herein in violation of Section 25110 of the California Corporations Code.

213.    Defendants Ripple and Garlinghouse, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management and policies of XRP II, through ownership of voting securities, by contract, subscription agreement, or otherwise. Defendant Garlinghouse also has the power to direct or cause the direction of the management and policies of Ripple.

214.    Defendants Ripple and Garlinghouse, separately or together, have sufficient influence to have caused XRP II and/or Ripple to submit a registration or qualification statement.

215.    Defendants Ripple and Garlinghouse, separately or together, jointly participated in, and/or aided and abetted, XRP II and/or Ripple's failure to register XRP in violation of Section 25110.

216.    By virtue of the conduct alleged herein, Defendants Ripple and Garlinghouse are liable for the wrongful conduct complained of herein and are liable to Plaintiff for rescission and/or damages suffered.

## <u>COUNT VI</u>
### False Advertising in Violation of Business and Professions Code Section 17500, et seq.
### (Against All Defendants)

217.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-217 above as if fully set forth herein.

218.    Plaintiff brings this sixth claim for relief for false advertising in violation of California Business and Professions Code Section 17500 under the alternative theory that XRP is not a security.

219.    Defendants operate a business where they intended to, and did, sell XRP to members of the general public, including Plaintiff.

220.    Defendants cause to be made or disseminated through California and the United States through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and Plaintiff.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 45 -     BMA LLC v. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-cv-3022

221.    Defendants have violated section 17500 because the misrepresentations and omissions they made, as set forth in above paragraphs of this Complaint were material and likely to deceive a reasonable consumer.

222.    As a direct and proximate result of Defendants' false advertisements, Plaintiff has suffered injury to their property and have been deprived of the benefits of fair competition. Plaintiff paid artificially inflated prices for XRP.

223.    Had the Plaintiff known the truth, he would not have purchased XRP and/or paid as much for it.

224.    As a result, Plaintiff has suffered damages in an amount according to proof at trial.

## COUNT VII
### Unfair Competition in Violation of Business and Professions Code Section 17200, et seq.
### (Against All Defendants)

225.    Plaintiff BMA incorporates the allegations set forth in Paragraphs 1-225 above as if fully set forth herein.

226.    Plaintiff brings this seventh claim for relief for unfair competition in violation of California Bus. & Prof. Code §§ 17200 under the alternative theory that XRP is not a security.

227.    California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the California Unfair Competition Law.

228.    Defendants have violated the unlawful prong of section 17200 by their violations of the federal and state securities laws, including Sections 5(a), 5(c), and 12(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a), Sections 25401, 25110, and 25503 of the California Corporations Code, and with respect to Defendants Ripple and Garlinghouse, Section 15 of the Securities Act, 15 U.S.C. § 77o and Sections 25504 and 25110 of the California Corporations Code.

229.    Defendants have also violated the unlawful prong of section 17200 by their violations of California's False Advertising Law (Bus. & Prof. Code §§ 17200, et seq.), as set

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 46 -     BMA LLC v. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-CV-3022

forth above.

230.    Defendants have also violated the "fraudulent" prong of section 17200 by making false and misleading statements regarding XRP to drive demand for XRP in order to artificially inflate the price at which they can sell XRP, as set forth in this Complaint. These false and misleading statements include statements regarding the genesis of XRP, the circulating supply of XRP, adoption of XRP, and are set forth in paragraphs 41-42, 47-48, 51-53, 56-57, 64-75.

231.    Defendants have also violated the "unfair" prong of section 17200 because the acts and practices set forth in this Complaint offend established public policy, and because the harm they cause to investors and purchasers of XRP greatly outweighs any benefits associated with those practices.

232.    Defendants' conduct has also prevented Plaintiff from making fully informed decisions about their purchases of XRP.

233.    In purchasing XRP, the Plaintiff relied on the misrepresentations made by Defendants. Plaintiff saw and relied on Ripple's repeated representations that adoption of XRP by financial institutions and banks would drive demand for XRP. Had the Plaintiff known the truth about XRP, he would not have purchased XRP and/or paid as much for it.

234.    The Plaintiff has suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices. As a result of the aforementioned acts, Plaintiff suffered an injury in fact, including the loss of money or property. Defendants received and continue to hold money and property belonging to Plaintiff.

235.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

236.    Plaintiff has no adequate remedy at law for the injuries, which it has suffered and will continue to suffer in the future.

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 47 -     BMA LLC V. RIPPLE LABS, INC., ET AL.    CASE NO. 3:20-CV-3022

1

## **PRAYER**

2

By reason of the foregoing, Plaintiff BMA respectfully requests that this Court:

3      (a)      enter a judgment that XRP is a security and that Defendants, and each of them,

4    conducted unregistered sales of XRP in violation of federal and California securities laws;

5      (b)      enter a judgment that Defendants, and each of them, have engaged in unfair

6    business practices in violation of Cal. Bus. & Prof. Code § 17200 et seq.;

7      (c)      enter a judgment pursuant to Cal. Bus. & Prof. Code § 17203, that Defendants, and

8    each of them, jointly and severally, be required to make restitution of any money or other

9    property that may have been acquired by their violations of Cal. Bus. & Prof. Code § 17200 et

10    seq. to Plaintiff BMA in an amount to be proven at trial;

11      (d)      enter a judgment pursuant to Cal. Bus. & Prof. Code § 17203, that Defendants, and

12    each of them, be permanently enjoined from engaging in unfair competition as defined in Cal.

13    Bus. & Prof. Code § 17200, including, but not limited to, the acts and practices alleged in this

14    Complaint;

15      (e)      enter a judgment that Defendants, and each of them, have engaged in false

16    advertising in violation of Cal. Bus. & Prof. Code § 17500 et seq.;

17      (f)      preliminarily and permanently enjoin Defendants, and each of them, their officers,

18    subsidiaries, affiliates distributors, agents, servants, employees, attorneys, and all persons in

19    active concert with them, from any further violation of Federal and California laws;

20      (g)      award compensatory damages to Plaintiff BMA and against all Defendants, and

21    each of them, jointly and severally, in the amount to be proven at trial;

22      (h)      award reasonable attorney fees, costs and prejudgment interest to Plaintiff BMA

23    and against all Defendants, and each of them, jointly and severally; and

24      (i)      award Plaintiff BMA such other relief as this Court deems just and proper.

25

26

27

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 48 -      BMA LLC v. RIPPLE LABS, INC., ET AL.      CASE No. 3:20-cv-3022

1

2      Dated:  May 1, 2020                              Respectfully submitted,

3                                                        By:    /s/ Pavel I. Pogodin, Ph.D.
                                                                Pavel I. Pogodin
4
                                                         CONSENSUS LAW
5                                                        Pavel I. Pogodin, Ph.D., Esq.
                                                         5245 Av. Isla Verde
6                                                        Suite 302
                                                         Carolina, PR 00979
7                                                        United States of America
                                                         Telephone: (650) 469-3750
8                                                        Facsimile: (650) 472-8961
                                                         Email: pp@consensuslaw.io
9                                                        Attorneys for Plaintiff
                                                         Bitcoin Manipulation Abatement LLC
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL)  - 49 -     BMA LLC V. RIPPLE LABS, INC., ET AL.   CASE NO. 3:20-CV-3022

1

## **DEMAND FOR JURY TRIAL**

2

3      Pursuant to Fed. R. Civ. P. 38, Plaintiff BMA demands trial by jury of all issues triable to a jury.

4

       Dated:  May 1, 2020                              Respectfully submitted,
5
                                                        By:  ___/s/ Pavel I. Pogodin, Ph.D.___
6                                                              Pavel I. Pogodin

7                                                       CONSENSUS LAW
                                                        Pavel I. Pogodin, Ph.D., Esq.
8                                                       5245 Av. Isla Verde
                                                        Suite 302
9                                                       Carolina, PR 00979
                                                        United States of America
10                                                      Telephone: (650) 469-3750
                                                        Facsimile: (650) 472-8961
11                                                      Email: pp@consensuslaw.io
                                                        Attorneys for Plaintiff
12                                                      Bitcoin Manipulation Abatement LLC

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSENSUS LAW
CRYPTOCURRENCY
ATTORNEYS

COMPLAINT FOR UNREGISTERED OFFER OF SECURITIES (JURY TRIAL) - 50 -      BMA LLC V. RIPPLE LABS, INC., ET AL.      CASE NO. 3:20-cv-3022